IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM DAVIS,

        Plaintiff,

vs.　　　　　　　　　　　　　　　　　　　Civ. No.  12-786 JCH/

WILSON & COMPANY ENGINEERS
AND ARCHITECTS, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's *Motion to Enforce Settlement Agreement* [Doc. 36]. The parties dispute whether they ever reached an enforceable agreement and, if so, what the terms of the agreement are. After reading the motion, response, reply, exhibits, and relevant law, the Court concludes that the motion should be denied.

## FACTUAL BACKGROUND

The following facts are drawn from the written evidence presented by the parties, although there appears to be no factual dispute regarding the relevant words or actions of any party to the settlement discussions at issue. Rather, Davis and Wilson are at odds over the legal implications of those words and actions. Neither party requested an evidentiary hearing on the motion.

On July 18, 2012, Plaintiff William Davis ("Davis") filed his complaint against his former employer, Defendant Wilson & Company Engineers and Architects, Inc. ("Wilson"), for unlawful discrimination on the basis of disability and age in violation of the Americans With Disabilities Act ("ADA") and Age Discrimination in Employment Act ("ADEA"), respectively,

as well as for unlawful retaliation for exercising his right to request an accommodation of his disability, in violation of Title VII. In his prayer for relief, Wilson requests lost earnings and benefits, costs, attorney's fees, and "damages for his mental anguish and humiliation." Doc. 1 at 5. The Complaint contains no mention of any physical injury suffered by Davis as a result of Wilson's actions.

On June 26, 2013, the Magistrate Judge held a settlement conference in this case. Although the case did not settle at that time, the parties made progress toward an agreement. In the following weeks, the parties continued their settlement discussions. In an email to Wilson's counsel dated July 8, 2013, Davis' counsel wrote, "I think we are close to a deal. Here is [sic] the terms as I understand them." He then enumerated five numbered provisions. The most relevant term for current purposes stated:

> 1. Payment of 157,500.00 in a lump sum. In the alternative if there is withholding only $2,500.00 will be classified as payment of wages less withholding, $2,500.00 reimbursement for flex spending account and the remaining $152,500.00 in lump sum. Mr. Davis agrees to pay and/or indemnify any taxes consequences.

Doc. 36-1. The other four terms included a neutral letter of reference to be issued by Wilson on behalf of Davis, payment of settlement proceeds by July 29, 2013, a mutual non-disparagement provision, and "confidentiality provisions and general release terms to be reviewed by parties." *Id*.

On July 16, 2013, with Davis's permission, Wilson's counsel filed a Notice of Settlement on the docket to alert the Court that the parties had settled the lawsuit. The following day, July 17, Wilson's counsel sent Davis via email a settlement agreement and release. It provided for payment by Wilson to Davis of a total amount of $157,500.00. Of that amount, $5,000.00, less statutory tax withholdings, would be paid as wage-based damages for which Wilson would issue

a form W-2. The draft agreement also stated that "WILSON will separately pay DAVIS $152,500.00, made payable as alleged compensatory damages to DAVIS, for which a Form 1099 will be issued to DAVIS." Doc. 36-1. Consistent with the July 8 email, the draft settlement agreement and release also provided that "DAVIS agrees to pay federal or state taxers, if any, which are required by law to be paid with respect to this settlement and Agreement." *Id*.

On July 18, 2013, Davis' counsel responded to the above email and draft settlement agreement and release. He stated:

> I reviewed the Release and I noticed that $5,000.00 is taxable. The terms were $2,500.00 wages and $2,500.00 flex account which I do not believe is taxable. I can resend the email on that issue. Also the time to revoke in paragraph two should be seven days not ten. Can you make these changes.

Doc. 36-1. Davis did not raise any issue regarding the $152,500.00 made payable to him as compensatory damages for which Wilson would issue a Form 1099. Later the same day, Wilson's counsel responded by sending Davis a new version of the settlement agreement and release making the changes he enumerated, including setting aside $2,500.00 as reimbursement for Davis' flex spending account. *Id*.

On July 23, 2013, Davis' counsel sent Wilson via email a copy of a settlement agreement and release signed by Davis, along with copies of IRS form W-9. Doc. 36-1, Ex. 6. Also attached was an additional copy of the settlement agreement highlighting the changes made by Davis. In pertinent part, this version of the settlement agreement provided that "WILSON will separately pay DAVIS $152,500.00, *made payable as alleged emotional distress damages due to physical injury and/or sickness* to DAVIS, for which a Form 1099 will be issued to DAVIS." *Id*. (emphasis added).

At this point, Davis' characterization of the payment of $152,500.00 as emotional distress damages that were due to physical injury and/or sickness became a gap that the parties were

3

unable to bridge. On August 6, 2013, Wilson's counsel outlined his client's objection to the above characterization of the damages and its basis for that objection. Doc. 36-1, Ex. 7. Wilson's counsel stated that the IRS requires compensatory damages for employment discrimination to be reported on an IRS For 1099-MISC, and that damages received for emotional distress related to employment claims are not considered damages for a physical injury or physical sickness. *Id*. Because the complaint alleged only "mental anguish and humiliation," and not any physical injury stemming from the discrimination, Wilson took the position that characterizing those damages as stemming from physical injury or sickness would be fraudulent. *Id*. On August 12, 2013, counsel for Davis responded, disagreeing with Wilson's assessment of the tax obligation and stating that the parties had previously agreed that only $2,500.00 of the settlement would be taxable. Doc. 36-1, Ex. 8. Davis also stated that Wilson should not oppose the characterization of the proceeds as reimbursement for a physical injury because Davis had agreed to bear any tax liability that might arise. *Id*. Counsel for Davis responded in an email dated August 18, 2013, stating that his client was not willing to participate in fraud on the IRS by characterizing Davis' damages as arising from a personal injury. Doc. 36-1, Ex. 9.

On August 19, 2013, in an effort to resolve the matter, the parties consulted the magistrate judge. Doc. 36-1, Ex. A at ¶ 17. The judge suggested the following language: "Davis will receive $152,500 in a lump sum for emotional distress damages (Plaintiff characterizes the damages as emotional distress damages resulting in physical sickness). Wilson will issue Mr. Davis a 1099." *Id*.  On August 20, 2013, Wilson informed Davis that it would accept this language in the settlement agreement. Doc. 36-1, Ex. 10.  However, Davis' counsel responded that he would not accept the language proposed by the magistrate judge, stating, "At this point, I do not think we have an agreement because there was no meeting on the minds on the tax issue.

Mr. Davis recalls that in the settlement conference he insisted to the Judge that Wilson work with him to ease the tax burden of the settlement. That is why we only agreed to $2,500.00 being taxable wage income." Doc. 36-1, Ex. 11.

On September 12, 2013, Davis's counsel emailed counsel for Wilson, stating, "Mr. Davis invokes his right to revoke." Doc. 36-1, Ex. 12.

## DISCUSSION

I.      **Law Governing Formation of Contracts**

The technical requirements for contract formation include an objective manifestation of mutual intent formed by a legal offer and acceptance of the material terms of the contract. *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283. A settlement agreement is a form of contract, *Builders Contract Interiors, Inc. v. Hi-Lo Industries, Inc.*, 2006-NMCA-053, ¶ 7, 139 N.M. 508, 134 P.3d 795, which must be factually supported by an offer, an acceptance, consideration, and mutual assent to be legally valid and enforceable. *Guest v. Allstate Ins. Co.*, 2009-NMCA-037, ¶ 12, 145 N.M. 797, 205 P.3d 844.

A contract can be express or implied. *See Orion Technical Res., LLC v. Los Alamos Nat'l Sec., LLC*, 2012-NMCA-097, ¶ 9, 287 P.3d 967. The New Mexico Court of Appeals stated that "[i]mplied-in fact contracts are founded upon a meeting of minds, which, although not embodied in an express contract, is inferred from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* (alteration, internal quotation marks, and citation omitted). "Our courts will . . . look to written representations, oral representations[, and] the conduct of the parties . . . to determine whether an implied-in-fact contract exists." *Id.* ¶ 10 (alterations, internal quotation marks, and citation omitted). An implied-in-fact contract can

be created by the representations of a party when the representations create a reasonable expectation of contractual rights. *Id*.

However, in addition to these common law standards, the Older Worker's Benefits Protection Act ("OWBPA"), imposes more stringent requirements for settlements of claims brought under the ADEA. The OWBPA provides, in relevant part:

> (1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum--
>
> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)(i) the individual is given a period of at least 21 days within which to consider the agreement

29 U.S.C. § 626(f). Thus, the OWBPA requires settlement agreement to be "executed," "written," and "in writing."

**II.     Analysis**

Wilson argues that even though both parties have not executed an express, written settlement agreement, they did reach a "meeting of the minds" on all the material terms of their

settlement such that there is an enforceable contract between Wilson and Davis settling all of Davis' legal claims, including his claim under the ADEA. In response, Davis argues that there is no enforceable settlement because the only written release agreement, per the OWBPA, that he signed was expressly rejected by Wilson. Davis contends that as a result of the lack of compliance with the OWBPA, there is no valid settlement. Wilson does not address this argument in its reply brief.

As the Supreme Court has explained, the OWBPA "is designed to protect the rights and benefits of older workers." *Oubre v. Entergy Operations, Inc*., 522 U.S. 422, 427, 118 S.Ct. 838 (1998). It "imposes specific requirements for releases covering ADEA claims." *Id*. at 424, 118 S.Ct. 838; *see also id*. at 427, 118 S.Ct. 838 ("The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word."). "The statutory command is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." *Id.* at 426-27, 118 S.Ct. 838. This means that an older worker such as Davis may waive an ADEA claim only by executing a written settlement agreement; an implied contract is not adequate.

As Davis has pointed out, the Tenth Circuit has interpreted the OWBPA's requirements. The language the Court used further supports the inference that a release of an ADEA claim must not only be in writing, but also signed by the employee:

> (1) the release *must be written* in a manner calculated to be understood by the employee *signing* the release, or by the average individual eligible to participate;
> 
> (2) the release must specifically refer to claims arising under the ADEA;
> 
> (3) the release must not purport to encompass claims that may arise after the date of execution;

7

(4) the employer must provide consideration for the waiver or release of ADEA claims above and beyond that to which the employee would otherwise already be entitled;

(5) the employee must be advised *in writing* to consult with an attorney *prior to executing* the agreement;

(6) the employee must be given at least 45 days to consider *signing* if the incentive is offered to a group;

(7) the release must allow the employee to revoke the agreement up to 7 days after *signing*; and

(8) if the release is offered in connection with an exit incentive or group termination program, the employer must provide information relating to the job titles and ages of those eligible for the program, and the corresponding information relating to employees in the same job titles who were not eligible or not selected for the program.

*Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1228 (10th Cir. 1999) (emphasis added) (citing 29 U.S.C. § 626(f)(1)(A)-(H)). Given this language, the language of the OWBPA itself, and the Supreme Court's interpretation of it in *Oubre*, the Court concludes that Davis has not signed a valid written waiver of his claims under the ADEA. The only written release agreement that Davis signed has been explicitly rejected by Wilson, and Wilson does not seek to enforce it. Rather, Wilson seeks to enforce an earlier, implied contract that was never signed or otherwise executed by Davis. The OWBPA does not permit enforcement of an unsigned, implied contract as a waiver of an ADEA claim. Hence, the Court concludes that Davis has not executed a valid settlement of his claim against Wilson under the ADEA, and it will deny Wilson's motion to enforce the settlement of his age discrimination claim.

This conclusion compels the Court to deny Wilson's motion in its entirety. The alleged release agreement purported to act as a settlement of all of Davis' claims, not merely his claim under the ADEA. Nothing in the parties' negotiations or draft agreements indicates that the

ADEA claim is in any way severable from the others; rather, the parties attempted to achieve a global agreement. This Court has no meaningful mechanism by which it can determine and enforce a settlement of Davis' ADA and Title VII claims only, because it appears that the parties never contemplated such a thing. Thus, there is no enforceable settlement agreement and release between Davis and Wilson.

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Enforce Settlement Agreement* [Doc. 36] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**